1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RONALD F. MARTINEZ, CDCR #T-86494, | Civil No.   12cv1298 GPC (MDD) |
| Plaintiff, | |
| vs. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED.R.CIV.P. 12(b)(6)** |
| R. MADDEN; I. CALDERON; A.B. GERVIN; O. MARTINEZ; O.K. RATLIFF; DOES 1-5, | |
| Defendants. | **(ECF Doc. No. 8)** |

        In this case, Ronald F. Martinez ("Plaintiff"), a prisoner currently incarcerated at Salinas

Valley State Prison ("SVSP"), is proceeding in pro se and *in forma pauperis* pursuant to 28

U.S.C. § 1915(a) and the Civil Rights Act, 42 U.S.C. § 1983.

        In his Amended Complaint, Plaintiff alleges Centinela State Prison ("CEN") officials

Madden, Gervin, Calderon, Martinez, and Ratliff ("Defendants"),[1] violated his constitutional

───────────────

        [1]  While Plaintiff's Amended Complaint also includes as defendants "Does 1-5," alleged to be officials employed at CEN in "positions unknown" whom he claims also retaliated against him, *see* Amend. Compl. (ECF Doc. No. 5) at 3, Plaintiff has never identified these potential parties, amended his pleading to name them, and has not served them with any pleading or summons. *See Walker v. Sumner*, 14 F.3d 1415, 1421-22 (9th Cir.1994) (where a pro se plaintiff fails to provide the Marshal with accurate and sufficient information to identify defendants and effect service of the summons and complaint within 120 days, the court's sua sponte dismissal of those unserved defendants is appropriate); FED.R.CIV.P. 4(m).

rights in August and November 2011, while he was incarcerated there, by retaliating against him for filing an inmate grievance ("CDC 602") against Gervin. *See* Amend. Compl. (ECF Doc. No. 5) at 1-13. Plaintiff seeks to have Defendants fired, injunctive relief preventing them from taking further reprisals against him,[2] and both general and punitive damages, including $25,000 for "emotional distress." *Id.* at 19.

Currently before the Court is Defendants' Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (ECF Doc. No. 8). After he was granted an extension of time, Plaintiff filed an Opposition (ECF Doc. No. 21). Defendants have no Reply. The Court has found the matter suitable for submission on the papers, and has held no oral argument. *See* S.D. Cal. CivLR 7.1(d)(1).

## I.    Factual Allegations

Plaintiff alleges that on August 7, 2011, he submitted a CDC Form 602 Inmate Appeal (Log No. CEN-C-11-00779) challenging changes made by CEN's Warden D. Uribe to the "'C' yard's level IV daily activity schedule." Plaintiff's CDC 602 alleged that the change in the schedule violated both due process and equal protection because it limited "A1A unassigned" inmates like him from accessing the recreational yard on weekends and holidays. (Amend. Compl. at 4.)

On August 25, 2011, Defendant Lt. Gervin conducted a second level review hearing of Plaintiff's CDC Form 602 Inmate Appeal, Log. No. CEN-C-11-00779. Plaintiff claims that when he entered Gervin's office, Gervin "started yelling" and "threatening" him. (*Id.*) Specifically, Plaintiff alleges Gervin asked him, "[W]ho did [he] think he was?" told him he "d[id] not know anything about due process and equal protection," upbraided him for "cit[ing] the incorrect Cal. Code Regs., tit. 15 sections," indicated that the Warden "can do whatever he wants," and warned Plaintiff that "if [he] wanted a job (in order to be[come] ... 'A1A'

---

[2] Because Plaintiff has been transferred from CEN to SVSP since his cause of action accrued there in 2011 and 2012, his claims for injunctive relief against Defendants, all alleged to be correctional officials at CEN, are moot. *See Preiser v. Newkirk*, 422 U.S. 395, 402-03 (1975) (where prisoner challenges conditions of confinement and seeks injunctive relief, a transfer to another prison renders his request for injunctive relief moot absent evidence of an expectation that he will be transferred back to offending institution); *accord Johnson v. Moore*, 948 F.3d 517, 519 (9th Cir. 1991) (per curiam).

assigned)," and to receive "weekend and holiday yard[]" privileges, he "was not going to like it." (*Id.*) Plaintiff, "frustrated with ... Gervin's personal attacks and threats," "informed [Gervin] he had earned those fucken [sic] A1A privileges." (*Id.*) Plaintiff claims Gervin "then threatened [him] by stating he would jump over th[e] desk and beat [him] if he cussed one more time" in front of Correctional Officer Cruz, a female. (*Id.* at 5.) Plaintiff apologized to Cruz, "informed her he was sure she ha[d] heard a lot worse from her male counterparts," and asked Gervin "if the 602 interview was over so [he] could leave because he was frightened." (*Id.*)

On or about September 26, 2011, Plaintiff filed a another CDC Form 602 Inmate Appeal (Log No. CEN-C-11-01055), this time to report Gervin's threats and "staff misconduct" during the August 25, 2011 hearing. (*Id.*) Plaintiff's CDC 602 requested that "no reprisals" be taken against him by either Gervin or "his agents" in response to the appeal. (*Id.*) On October 11, 2011, C Facility Captain Carmargo conducted a first level review of Plaintiff's claims, informed him she would interview Gervin and Cruz, and that if his allegations were found to be true, she would "take the appropriate action(s) against Lt. Gervin." (*Id.*) On November 11, 2011, however, Plaintiff claims he received a first level response from Associate Warden Defendant Madden, which denied his appeal based on a finding that Gervin "did not violate any CDC policy." (*Id.*)

Four days later, on November 14, 2011, while Plaintiff was "conducting his function" as the Mens' Advisory Council (MAC) Secretary for housing unit C4,[3] Defendant Lt. Martinez issued Plaintiff a "CDC 114-D (lock-up order)" authorizing his placement in the Administrative Segregation Unit ("Ad-Seg") "pending an investigation by Sgt. Ratliff" into Plaintiff's alleged involvement in a "conspiracy to assault a peace officer." (*Id.* at 6, 7.) Plaintiff claims "the

/ / /

/ / /

---

[3]  The MAC is "a representative association of prison inmates organized at the behest of ... the Warden ... to advise him of complaints and recommendations from the inmates, and to communicate his administrative decisions back to them. The general prison population elects the Council's members." *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 196 (1993). Plaintiff does not attribute his position on the MAC to any alleged act of retaliation against him, but instead focuses solely on his CDC 602 inmate appeal activity against Gervin.

1   evidence [] Martinez relied upon to justify his placement in Ad-Seg" was "in the form of a 'kite'

2   being dropped on Plaintiff's cell number." (*Id.* at 7.)[4]

3       Plaintiff was handcuffed and escorted to the Program Office by Sgt. Lamm, who ordered

4   him to "roll-up" out of cell C4-210.  (*Id.* at 6.)  Because Plaintiff's cellmate was not also "rolled

5   up," he became "immediately suspicious" because "whenever an inmate is rolled-up for

6   'conspiracy to assault staff,'" his cellmate "is automatically rolled-up and placed in Ad-Seg

7   also." (*Id.* at 6.)

8       On the next day, November 15, 2011, Defendant Madden held an Ad-Seg placement

9   hearing pursuant to CAL. CODE REGS., tit. 15 § 3337.[5]  At this hearing Plaintiff "strongly

10  asserted" his belief that Lt. Martinez's CDC 114 lock-up order "reek[ed] of retaliation" because

11  it came so soon on the heals of Plaintiff's CDC Form 602 against Gervin.  (*Id.* at 8.)  When

12  Madden "stated that Defendant Gervin was not even working the day (Nov. 14, 2011) Plaintiff

13  was placed in Ad-Seg," Plaintiff remarked that he found it "interesting [Madden] would know

14  this information off the top of his head," and suggested Gervin "was not that stupid, [and] would

15  have one of his fellow buddies like Lt. Martinez put the twist on [him]." (*Id.*)

16      Plaintiff alleges Lts. Gervin, Martinez, and Assoc. Warden Madden, in fact, "fabricated

17  ... the [...] 'kite' evidence" in order to justify his placement in Ad-Seg as a "guise" that he was

18  involved in a conspiracy to assault a peace officer in order to retaliate against him for filing his

19  September  26, 2011 CDC 602 grievance against Gervin.  (*Id.* at 7, 8-9.)

20      On November 17, 2011, Plaintiff appeared before an Institutional Classification

21  Committee ("ICC"), which included Defendant Calderon, a Chief Deputy Warden at CEN.  (*Id.*

22

23      [4] "A letter smuggled past prison officials to another prisoner is called a 'kite.'" *United States
    v. Keys*, 133 F.3d 1282, 1285 (9th Cir. 1998).  Plaintiff claims he learned, during "an investigation

24  interview" with Defendant Sgt. Ratliff on December 16, 2011, and while he was still in Ad-Seg, that
    "the alleged 'kite' made no direct reference to Plaintiff's name as the person who was conspiring to

25  assault staff." (Amend. Compl. at 7.)

26      [5] "On the first work day following an inmate's placement in administrative segregation,
    designated staff at not less than the level of correctional captain will review the order portion of the CDC

27  Form 114-D," and make determinations as to "the appropriate assignment of staff assistance," "the
    inmate's desire to call witnesses or submit other documentary evidence," whether the "inmate has

28  waived the 72-hour time limit in which a classification hearing cannot be held," whether he "desires
    additional time to prepare for a classification hearing," and "the most appropriate date and time for a
    classification hearing." CAL. CODE REGS., tit. 15 § 3337(a)-(d) (Jan. 2013).

at 2, 9.)  Plaintiff claims Calderon and the ICC elected to retain him in Ad-Seg pending Defendant Ratliff's completion of the investigation into Plaintiff's alleged participation in a conspiracy to assault a peace officer, despite being "aware" that the "kite evidence" did not specifically identify Plaintiff by name.  (*Id.* at 9.)  Plaintiff "stated his disagreement" with the ICC's decision, and "told Calderon that his placement and retention in Ad-Seg ... was fabricated by ... Gervin, Lt. Martinez[,] and their associates" as a "purely retaliatory act[] for Plaintiff filing staff misconduct 602 ... against Lt. Gervin."  (*Id.* at 10; *see also* Pl.'s Opp'n [ECF Doc. No. 21-2] Ex. C at 4 CDC 128-G dated 11/17/11.)

Between November 27, 2011 and until December 16, 2011, while Plaintiff was retained in Ad-Seg pending investigation into the kite, he alleges to have submitted numerous inmate requests to Defendants Ratliff and Madden inquiring as to "when ... Ratliff was going to start his investigation ... and interview [him]."  (Amend. Compl. at 10.)  Plaintiff claims to have received no response, but after "an unnecessary and intentional delay of approximately thirty-three (33) days," on December 16, 2011, Defendant Ratliff interviewed him about his "alleged involvement into the 'conspiracy to assault a peace officer'" on C Facility.  (*Id.*)  During this interview, Plaintiff denied any problems with staff or that he was planning to assault staff on C Facility, and asked Ratliff what evidence was discovered.  (*Id.* at 10-11.)  Ratliff informed Plaintiff that a "'kite' was dropped on Plaintiff's cell (C4-210)," but confirmed that the kite "did not have Plaintiff's name on it."  (*Id.* at 11.)  When Plaintiff asked Ratliff why his cellmate was not "rolled up," Ratliff said he did not know.  (*Id.*)  After the interview, Plaintiff claims Ratliff issued a CDC 128-B Chrono "completing his investigation and f[inding] Plaintiff was not involved."  (*Id.*; *see also* Pl.'s Opp'n [ECF Doc. No. 21-2] Ex. C. at 5, CDC-128B dated 12/16/11.)  However, Plaintiff alleges Ratliff also retaliated against him "for filing the Gervin's threat 602," by "intentionally delaying the start of [his] investigation." (Amend. Compl. at 11.)  Plaintiff claims Gervin is Ratliff's "immediate supervisor on C Facility."  (*Id.* at 10.)

On January 26, 2012, "forty (40) days after Ratliff completed his investigation," Plaintiff re-appeared before an ICC panel, including Defendants Madden and Calderon.  (Amend. Compl. at 12; *see also* Pl.'s Opp'n [ECF Doc. No. 21-2] Ex. C at 6.)  The ICC noted that because the

investigation into his suspected involvement in a conspiracy to assault staff had been completed, and Ratliff's CDC 128B dated 12/16/11 recommended Plaintiff be released from Ad-Seg because "there was no corroborating information"[6] to support a charge of conspiracy to assault staff, Plaintiff was no longer deemed a threat to the safety and security of the institution, and cleared for release to C Facility's general population.  (*Id.*)  At that time, "[a]s permitted per [CAL. CODE REGS., tit. 15 §] 3375(g)(1)(D), Plaintiff stated his dissatisfaction with his placement in Ad-Seg and alleged Defendants [] Gervin, Martinez, Madden, Calderon, and various Centinela officials [had] fabricated the 'kite' evidence ... in order to retaliate against [him] for submitting a staff misconduct 602 against their union representative and colleague Lt. Gervin." (Amend. Compl. at 12; *see also* Pl.'s Opp'n Ex. C at 6.)  Plaintiff further alleges Madden "cut [him] short and informed him he would see [him] at his annual review in March 2012." (Amend. Compl. at 12.)

Plaintiff claims Defendants Madden and Calderon retaliated against him by "intentionally delaying his appearance before [the] ICC for approximately 33 days after the completion of the investigation" on December 16, 2011," because "it takes one (1) week to be scheduled and seen by an ICC after the completion of an investigation."  (*Id.* at 12-13.)

## II.   DEFENDANTS' MOTION TO DISMISS

Defendants seek dismissal of Plaintiff's Amended Complaint pursuant to FED. R. CIV. P. 12(b)(6) on grounds that he has failed to state a retaliation claim as to each of them.  *See* Defs.' P&As in Supp. of Mot. to Dismiss (ECF Doc. 8-1) at 3-8.  Plaintiff has filed an Opposition which includes exhibits in support (ECF Doc. No. 21).

### A.   FED. R. CIV. P. 12(b)(6) Standard of Review

A Rule 12(b)(6) dismissal may be based on either a "'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica*

---

[6] Pursuant to CAL. CODE REGS., tit. 15 § 3321(b), "[n]o decision shall be based upon information from a confidential source, unless other documentation corroborates information from the source, or unless the circumstances surrounding the event and the documented reliability of the source satisfies the decision maker(s) that the information is true."  *Id.* § 3321(b)(1) (Jan. 2013).

*Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).  In other words, the plaintiff's complaint must provide a "short and plain statement of the claim showing that [he] is entitled to relief." *Id.* (citing FED.R.CIV.P. 8(a)(2)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 679 (citing *Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678; *Twombly*, 550 U.S. at 555 (on motion to dismiss court is "not bound to accept as true a legal conclusion couched as a factual allegation.").  "The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citations omitted).

In analyzing a pleading, the Court sets conclusory factual allegations aside, accepts all non-conclusory factual allegations as true, and determines whether those non-conclusory factual allegations accepted as true state a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 676–684; *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (noting that the court need not accept legal conclusions, unwarranted deductions of fact, or unreasonable inferences as true).  And while "[t]he plausibility standard is not akin to a probability requirement," it does "ask[] for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted). In determining plausibility, the Court is permitted "to draw on its judicial experience and common sense." *Id.* at 679.

Nevertheless, claims asserted by pro se petitioners, "however inartfully pleaded," are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519-20 (1972).  Thus, courts "continue to construe pro se filings liberally when evaluating them under *Iqbal*." *Hebbe v. Pliler*, 627 F.3d 338, 342 & n.7 (9th Cir. 2010) (citing *Bretz v.*

*Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (noting that courts "have an obligation where the petitioner is *pro se*, particularly in civil rights cases, to construe the pleadings liberally and to afford the petitioner the benefit of any doubt.")).

Finally, when resolving a motion to dismiss for failure to state a claim, the court may not generally consider materials outside the pleadings, except for exhibits which are attached. *See* Fed.R.Civ.P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Schneider v. California Dept. of Corrections*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998); *Jacobellis v. State Farm Fire & Casualty Co.*, 120 F.3d 171, 172 (9th Cir. 1997); *Allarcom Pay Television Ltd. v. General Instrument Corp.*, 69 F.3d 381, 385 (9th Cir. 1995). "The focus of any Rule 12(b)(6) dismissal ... is the complaint." *Schneider*, 151 F.3d at 1197 n.1.

This precludes consideration of "new" allegations that may be raised in a plaintiff's opposition to a motion to dismiss brought pursuant to Fed.R.Civ.P. 12(b)(6). *Id.* (citing *Harrell v. United States*, 13 F.3d 232, 236 (7th Cir. 1993); 2 Moore's Federal Practice, § 12.34[2] (Matthew Bender 3d ed.) ("The court may not . . . take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a).")). Thus, if a complaint fails to state a claim, the plaintiff may not insert the missing allegations in the opposition. *Harrell*, 13 F.3d at 236. "He is free however to submit documents which show that the complaint as worded encompasses a claim that would entitle him to relief." *Id.* (citations omitted).

**B.     Retaliation Claims**

Within the prison context, a viable claim of First Amendment retaliation entails five basic elements. *Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir. 2000). First, the plaintiff must allege that the retaliated-against conduct is protected. The filing of an inmate grievance is protected conduct. *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009); *Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2005). Second, the plaintiff must claim the defendant took adverse action against the plaintiff. *Rhodes*, 408 F.3d at 567. The adverse action need not be an independent constitutional violation. *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Instead, "the mere

threat of harm can be an adverse action." *Brodheim*, 584 F.3d at 1270. Third, the plaintiff must allege a causal connection between the adverse action and the protected conduct. Because direct evidence of retaliatory intent rarely can be pleaded in a complaint, allegation of a chronology of events from which retaliation can be inferred is sufficient to survive dismissal. *See Pratt*, 65 F.3d at 808 ("timing can properly be considered as circumstantial evidence of retaliatory intent"). Fourth, the plaintiff must allege that the "official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Rhodes*, 408 F.3d at 568 (internal quotation marks and emphasis omitted). "[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm," *Brodheim*, 584 F.3d at 1269, that is "more than minimal," *Rhodes*, 408 F.3d at 568 n.11. That the retaliatory conduct did not chill the plaintiff from suing the alleged retaliator does not defeat the retaliation claim at the motion to dismiss stage. *Id.* at 569.

## C. Discussion

To the extent Plaintiff's retaliation claims against Gervin focus on his behavior during the August 25, 2011 second level review hearing on Plaintiff's CDC 602 Log No. CEN-C-11-00779, Gervin argues that Plaintiff has failed to state a claim against him he has failed to allege that Gervin took any action against him that was "adverse." Second, Gervin, Martinez, and Madden argue Plaintiff's fabricated kite allegations are "implausible" and rely merely on "naked conclusions and unsupported inferences." (Defs.' P&A's in Supp. of Mot. [ECF Doc. No. 8-1] at 3-5, 7-8 citing *Iqbal*, 556 U.S. at 678-79.) Finally, Martinez, Ratliff, and Calderon argue Plaintiff's claims against them are insufficient to show any of them were aware of Plaintiff's previous CDC 602 grievance against Gervin; therefore, he has failed to allege plausible facts which demonstrate they acted against him "because of" his protected conduct. (*Id.* at 3, 6-7.)

First, as to Lt. Gervin actions on August 25, 2011, Plaintiff alleges Gervin conducted the second level interview at to his CDC 602 (Log No. CEN-C-11-00779) involving limitations on his recreational yard access, and that he "started yelling at [him] and threatening [him]" during the hearing, accused him of knowing nothing about due process and equal protection, and "threaten[ed] to deny" Plaintiff's grievance "because [he] cited the incorrect" prison regulation.

(Amend. Compl. at 4.)  When Plaintiff became "frustrated with ... Gervin's personal attacks and threats" and used profane language in response, Plaintiff further alleges Gervin "stat[ed] he would jump over th[e] desk and beat [him]."  (*Id.*)

Gervin argues that he was simply "engaged in an interview regarding [Plaintiff's] grievance," and that he had a legitimate penological purpose in "explor[ing] and challeng[ing] his claims," (Defs.' Mem. of P&As at 5);  therefore, Plaintiff has failed to allege his actions were adverse.  *Rhodes*, 408 F.3d at 567.

However, Plaintiff contends Gervin went further than simply "exploring" the grounds for Plaintiff's grievance, actually threatened his safety, "frightened" and "had a chilling effect on [him]."  (Amend. Compl. at 4-5.)  In *Brodheim*, the Ninth Circuit held that a prisoner alleging retaliation "need not establish that [the prison official's] statement contained an explicit, specific threat of discipline or transfer."  584 F.3d at 1270.  Even "a statement that 'warns' a person to stop doing something carries the implication of some consequence of a failure to heed that warning," is sufficient to show "some form of punishment or adverse regulatory action."  *Id.* at 1270-71.  Thus, the Court finds that Plaintiff's allegations against Gervin related to the August 25, 2011 CDC 602 hearing are sufficient to plead the "adverse action" element of a First Amendment retaliation claim.  *See Rhodes*, 408 F.3d at 567.

Second, Defendants Martinez, Gervin, and Madden argue that to the extent Plaintiff claims they "fabricated the ... 'kite' evidence" which was used to justify his placement in [Ad-Seg] for the 'conspiracy to assault a peace officer,'" his allegations constitute only "naked conclusions and unsupported inferences," and thus, are insufficient to support a "plausible claim for relief."  (Defs.' P&As in Supp. of Mot. at 4-5, 8 citing *Iqbal*, 556 U.S. at 678-79.)  As to Defendant Martinez, the Court agrees.  As to Defendants Gervin and Madden, however, the Court disagrees.

In *Bruce v. Ylst*, 351 F.3d 1283 (9th Cir. 2003), the Ninth Circuit determined that triable issues of fact existed to support a retaliation claim where the plaintiff alleged he was falsely accused of prison gang activity because he had filed inmate grievances.  *Id.* at 1288-89.  In *Bruce*, the prisoner, like Plaintiff in this case, pointed to the "suspect timing of the validation–

coming soon after his success in [filing] prison conditions grievances," the fact that the same evidence used to support his validation had previously been determined insufficient, *and* that the prison officials who validated him knew he had "pissed off higher-ups" with his "complaints and protests," as circumstantial evidence sufficient to support an inference of retaliatory motive. *Id.* Indeed, even years prior to *Bruce*, the Ninth Circuit made clear that while "the timing and nature" of an allegedly adverse action can "properly be considered" as circumstantial evidence of a retaliatory intent, the officials alleged to have retaliated must also have been *aware* of the plaintiff's protected conduct in order to support that inference.  *See Sorrano's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1315-16 (9th Cir. 1989); *Pratt*, 65 F.3d at 808.

As to Plaintiff's allegations against Defendants Gervin and Madden, the Court finds his fabricated kite claims are not merely "unsupported inferences," under *Iqbal*, but rather, are sufficient, when coupled with Plaintiff's additional allegations, to state a plausible claim of retaliation.  556 U.S. at 679; *Bruce*, 351 F.3d at 1288-89.  Like the Plaintiff in *Bruce*, Plaintiff alleges to have been accused of conspiracy to assault a peace officer and placed in Ad-Seg as a result of false evidence he claims was manufactured by Gervin and Madden just days after he learned that his CDC 602 staff misconduct complaint against Gervin had been dismissed by Madden.  *See* Amend. Compl. at 5; *Pratt*, 65 F.3d at 808.  Plaintiff specifically alleges that Gervin was aware of his grievance because he was informed on October 11, 2011 that Captain Carmargo would interview Gervin and Cruz, and "take appropriate action" against Gervin if his allegations were found to be true. (Amend. Compl. at 5.)  Plaintiff further alleges that  Madden, in his capacity as Associate Warden, was the person who reviewed and denied his grievance against Gervin.  (*Id.*)  This knowledge, when coupled with the timing of the kite which implicated him in a conspiracy to assault peace officers, resulted in his segregation for more than two months, and was ultimately found to be uncorroborated, while perhaps not conclusive of retaliatory motive, is sufficient to "plausibly suggest an entitlement to relief" against Defendants Gervin and Madden.  *See Iqbal*, 556 U.S. at 681; *see also Watison v. Carter*, 668 F.3d 1108, 1115 (9th Cir. 2012) (reversing district court's dismissal of retaliation claims for failing to state a claim where prisoner alleged he filed a grievance against an official, and "shortly after" was

accused of "false" disciplinary charges, segregated, and denied parole based in part, on prison officials' "lies to the parole board.").

Plaintiff's claims against Lt. Martinez, however, specifically that he issued Plaintiff's CDC 114 "lock-up" order based on information contained in the kite that he, along with Gervin and Madden "fabricated" as a "guise" in order to retaliate against Plaintiff for filing a grievance against Gervin (Amend, Compl. at 7-8), *do* fail to state a plausible claim for relief because they are based on an unsupported assumption that Martinez *knew* about Plaintiff's previous grievance against Gervin, and instead rely solely on Plaintiff's speculation that Gervin "was not that stupid, [and] would have one of his fellow buddies like Lt. Martinez put the twist on [him]." (Amend. Compl. at 8.)  *See Pratt*, 65 F.3d at 808 (rejecting prisoner's claims of suspect timing where he did not also allege that official was "actually aware" of his protected conduct); *Iqbal*, 556 U.S. at 678 (noting that facts which are "merely consistent with" a defendant's liability, but "stop[] short of the line between possibility and plausibility of 'entitlement to relief,'" are insufficient to survive a motion to dismiss) (citation omitted).

Plaintiff's allegations against the remaining Defendants, Sgt. Ratliff and Chief Deputy Warden Calderon, fail to state a plausible claim for retaliation for the same reasons.  Plaintiff alleges Ratliff was assigned to investigate the kite, and that he "intentionally" delayed his investigation "in retaliation for Plaintiff's "filing the Gervin's threat 602." (Amend. Compl. at 10, 11.)  However, Plaintiff alleges no facts to plausibly suggest how or why Ratliff was even aware of Plaintiff's previous grievance against Gervin, and like his claims against Lt. Martinez, simply speculates that Ratliff delayed his investigation because Gervin was his "immediate supervisor."  (*Id*. at 10.)  *See Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more that the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'– 'that the pleader is entitled to relief.'") (citing FED.R.CIV.P. 8(a)(2)); *see also Pratt*, 65 F.3d at 808 (finding it "sheer speculation to assume" that one official with knowledge of the plaintiff's protected conduct "discussed" that activity with his superiors).

Plaintiff alleges Deputy Warden Calderon was a member of the ICC that initially reviewed his Ad-Seg placement on November 17, 2011, authorized his retention in Ad-Seg

1   pending completion of Ratliff's investigation into the kite, and "intentionally delayed" his

2   second appearance before the ICC after Ratliff's investigation was complete.  (Amend. Compl.

3   at 9.)  While Plaintiff alleges Calderon was "aware" that the kite did not identify him by name

4   on November 17, 2011–a full month before he alleges Ratliff completed his investigation into

5   the kite–he still alleges no facts which might support an inference that Calderon knew, or had

6   any reason to know, that Plaintiff had previously filed any grievances against Gervin, until

7   Plaintiff himself "told" Calderon during his November 17, 2011 and January 26, 2012 ICC

8   hearings that *he* believed the kite was fabricated in retaliation for his staff misconduct complaint

9   against Gervin.  (*Id.* at 10, 12.)  *See Iqbal*, 556 U.S. at 679; *Pratt*, 65 F.3d at 808.

10         As to Plaintiff's claims that both Ratliff and Calderon "intentionally delayed" the

11   investigation into the kite or his release from Ad-Seg after its completion, the Court finds these

12   allegations too are simply "naked assertions devoid of further factual enhancement," and thus,

13   insufficient to show a plausible entitlement to relief.  *See* Amend. Compl. at 11, 12-13; *Iqbal*,

14   556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557).  Indeed, the Court finds, in its "judicial

15   experience" with prison disciplinary proceedings and the "common sense" security issues ever-

16   present within a dangerous institutional setting, *id.* at 679, that the "more likely explanation" for

17   delay was Defendants' need to fully complete the investigation into a kite that contained

18   information related to a potentially dangerous plan to assault staff emanating from Plaintiff's

19   cell, and to either initiate disciplinary proceedings against him or release him if that investigation

20   turned up no corroborating evidence of his involvement. *Id.* at 682 (analyzing "obvious

21   alternative explanations" and rejecting purposeful discrimination as a "plausible conclusion"

22   sufficient to survive defendants' motion to dismiss).[7]

23   / / /

24   _____

25         [7] In fact, Plaintiff's First Level Appeal Response to the CDC 602 he filed on December 4, 2011,
     Log No. CEN-A-11-01257, which he attaches to his Opposition and is related to the retaliation claims
26   alleged in this action, indicates that "as of  [January 4, 2011], the investigation ha[d] not been
     completed," that "investigations normally take between 30 and 120 days to complete depending on the
27   complexity of the issues," and that Plaintiff had a "Classification Staff Representative (CSR) approved
     extension for continued [Ad-Seg] placement until February 15, 2012."  *See* Pl.'s Opp'n, Ex. C [ECF
28   Doc. No. 21-1] at 24.  Plaintiff was informed that "once the investigation [was] complete[], [he would]
     be scheduled for the next available ICC." *Id.*; *see also* CAL. CODE REGS., tit. 15 § 3335(d)(1),(2), (e)(3)
     (Jan. 2013).

Finally, the Court further finds that to the extent Plaintiff implies that Calderon, Martinez, Ratliff, and Madden all conspired to retaliate against him for filing a CDC 602 against Gervin because Gervin was "their union representative and colleague," Plaintiff's assertion amounts to no more than a mere "unwarranted deduction" which is insufficient to support a reasonable inference that they *knew* he had filed a grievance against Gervin and decided to retaliated against him because of it.  Amend. Compl. at 12; *Iqbal*, 556 U.S. at 678; *Sprewell*, 266 F.3d at 988; *Rhodes*, 408 F.3d at 567 (noting that viable claim of retaliation entails, in part, "[a]n assertion that a state actor took some adverse action against an inmate ... *because of* ... that prisoner's protected conduct..." (italics added)).

## III.   CONCLUSION AND ORDER

Based on the foregoing, the Court hereby DENIES Defendants' Motion to Dismiss Plaintiff's retaliation claims against Lt. Gervin and Associate Warden Madden, and GRANTS Defendants' Motion to Dismiss Plaintiff's retaliation claims against Lt. Martinez, Sgt. Ratliff and Chief Deputy Warden Calderon pursuant to FED.R.CIV.P. 12(b)(6) (ECF Doc. No. 8).

The Court further ORDERS Defendants Gervin and Madden to file an Answer to Plaintiff's Amended Complaint within the time provided by FED.R.CIV.P. 12(a)(4)(A).

**IT IS SO ORDERED.**

DATED:  September 16, 2013

HON. GONZALO P. CURIEL
United States District Judge